## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF GEORGIA
## MACON DIVISION

| | |
|---|---|
| CHOUNTELLE HUDSON, | |
| *Plaintiff,* | |
| v. | CIVIL ACTION NO. 5:24-cv-00259-TES |
| MACON BIBB PLANNING & ZONING COMMISSION, | |
| *Defendant.* | |

## ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO DISMISS

Proceeding pro se, Plaintiff Chountelle Hudson is suing the Macon-Bibb County Planning and Zoning Commission for alleged violations of Title VII and O.C.G.A. § 16-10-94, and the Commission now seeks dismissal of her Complaint [Doc. 1] pursuant to Federal Rule of Civil Procedure 12(b)(6).[1] [Doc. 1, p. 3]; [Doc. 4, p. 1].

---

[1] Title 16 of the Official Code of Georgia Annotated houses Georgia's criminal statutes, and the specific statute Plaintiff relies on, O.C.G.A. § 16-10-94(a), makes it crime for any person to tamper with evidence. However, § 16-10-94 only creates a right in favor of the general public, it does not supply Plaintiff with a private right of action to recover damages for its alleged violation. *Jastram v. Williams*, 623 S.E.2d 686, 687 (Ga. Ct. App. 2005) ("Criminal statutes, which express prohibitions rather than personal entitlements and specify a particular remedy other than civil litigation, are accordingly poor candidates for the imputation of private rights of action."); *Harrison v. Blackledge*, No. 1:19-CV-1811-MHC, 2019 WL 13212716, at *8 (N.D. Ga. Dec. 20, 2019) (citing *Roberts v. State*, 634 S.E.2d 790, 792 (Ga. Ct. App. 2006)) ("[N]either an accused nor a third-party private citizen may prosecute a criminal matter on his or her own."). Therefore, the Court **GRANTS** the Commission's Motion with respect to Plaintiff's claim brought under O.C.G.A. § 16-10-94, and it **DISMISSES** that claim **with prejudice** for failure to state a claim.

## LEGAL STANDARD

When ruling on a motion under Rule 12(b)(6), it is a cardinal rule that district courts must accept the factual allegations set forth in a complaint as true. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 572 (2007). In accepting the factual allegations as true, courts are to construe the reasonable inferences from them in the light most favorable to the plaintiff. *Hawthorne v. Mac Adjustment, Inc.*, 140 F.3d 1367, 1370 (11th Cir. 1998).

However, through Rule 12(b)(6), a defendant may "test the facial sufficiency" of a complaint by way of a motion to dismiss. *Ghee v. Comcast Cable Commc'ns, LLC*, No. 22-12867, 2023 WL 3813503, at *2 (11th Cir. June 5, 2023) (quoting *Brooks v. Blue Cross & Blue Shield*, 116 F.3d 1364, 1368 (11th Cir. 1997)). Such a "motion is an 'assertion by a defendant that, even if the facts alleged by a plaintiff are true, the complaint still fails as a matter of law to state a claim upon which relief may be granted.'" *Barreth v. Reyes 1, Inc.*, No. 5:19-cv-00320-TES, 2020 WL 4370137, at *2 (M.D. Ga. July 29, 2020) (citation omitted). However, a complaint will survive a Rule 12(b)(6)-based motion if it alleges sufficient factual matter (accepted as true) that states a claim for relief that is plausible on its face. *McCullough v. Finley*, 907 F.3d 1324, 1333 (11th Cir. 2018) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009)).

Now, whether a complaint states a claim for relief is measured by reference to the pleading standard of Federal Rule of Civil Procedure 8—a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P.

8(a)(2); *Barreth*, 2020 WL 4370137, at *2 (citation omitted). Rule 8 doesn't require detailed factual allegations, but it does require "more than unadorned, the-defendant-unlawfully-harmed-me accusations." *McCullough*, 907 F.3d at 1333 (citation omitted) (alterations adopted). Its sole purpose is to provide a defendant "with 'fair notice' of the claims and the 'grounds' for entitlement to relief." *Barreth*, 2020 WL 4370137, at *2 (citation omitted); *Twombly*, 550 U.S. at 555–56.

To decide whether a complaint survives a motion to dismiss, courts use a two-step framework. *McCullough*, 907 F.3d at 1333 (citation omitted). The first step is to identify the allegations that are "no more than conclusions." *Id.* (quoting *Iqbal*, 556 U.S. at 679). "Conclusory allegations are not entitled to the assumption of truth." *Id.* After disregarding the conclusory allegations, the second step is to "assume any remaining factual allegations are true and determine whether those factual allegations 'plausibly give rise to an entitlement to relief.'" *Id.* "A court decides whether [Rule 8's pleading standard] is met by separating the legal conclusions from the factual allegations, assuming the truth of only the factual allegations, and then determining whether those allegations allow the court to reasonably infer that [a] plaintiff is entitled to the legal remedy sought." *Barreth*, 2020 WL 4370137, at *2 (citation omitted).

When drafting a complaint, "[a] plaintiff must plead more than labels and conclusions or a formulaic recitation of the elements of a cause of action." *McCullough*, 907 F.3d at 1333 (quoting *Twombly*, 550 U.S. at 555). A plaintiff may use legal

conclusions to structure a complaint, but they "must be supported by factual allegations." *McCullough*, 907 F.3d at 1333 (quoting *Iqbal*, 556 U.S. at 679). While courts, in ruling on a motion to dismiss, must take all of the factual allegations in a complaint as true, they are not bound to accept a legal conclusion couched as a factual allegation. *Iqbal*, 556 U.S. at 678. Courts must "identify conclusory allegations and then discard them—not 'on the ground that they are unrealistic or nonsensical' but because their conclusory nature 'disentitles them to the presumption of truth.'" *McCullough*, 907 F.3d at 1333 (quoting *Iqbal*, 556 U.S. at 681).

The issue to be decided when considering a motion to dismiss "is necessarily a limited one." *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974) *overruled on other grounds by Davis v. Scheuer*, 468 U.S. 183 (1984). The issue is not whether the claimant will ultimately prevail, but "whether the claimant is entitled to offer evidence to support the claims." *Id.* The factual allegations in a complaint "must be enough to raise a right to relief above the speculative level" and cannot "merely create[ ] a suspicion of a legally cognizable right of action." *Twombly*, 550 U.S. at 555. Finally, a complaint that tenders "'naked assertions' devoid of 'further factual enhancement'" will not survive against a motion to dismiss. *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557) (cleaned up). To survive, a complaint must allege enough facts "to raise a reasonable expectation that discovery will reveal evidence" supporting a claim. *Twombly*, 550 U.S. at 556.

## FACTUAL BACKGROUND

As she should've, Plaintiff used the Court's standard form that aids pro se litigants in presenting employment discrimination claims. Is that form perfect? No. Does it help? Certainly. Admittedly, though, after pro se plaintiffs fill in the required information about their defendant (or defendants, depending on the case), check the applicable "boxes" for their claims, and give some ancillary information, there isn't a whole lot of room left for them to provide the factual detail that allegedly supports those claims. Easily enough, that's exactly why the form instructs pro se litigants to "[a]ttach additional pages" to lay out the facts of their case. [Doc. 1, p. 4].

In no less than 17 pages, Plaintiff did just that.[2] [*Id.*]; [Doc. 1-1]. However, Plaintiff's 17-page synopsis of her case led the Commission to gripe about how she presented her claims. *See, e.g.*, [Doc. 4-1, pp. 2, 4]. As a pro se litigant, though, what else was she supposed to do besides use and follow the instructions on the Court's standard form? [Doc. 4-1, pp. 2, 4]. Is it less easy to decipher claims when they're presented by a non-attorney plaintiff? Sure it is, but when faced with protracted and detailed allegations, the best thing defendants (and courts) can do is take a deep breath and tell that plaintiff's story. As you'll soon see, that's the course of action the Court took with Plaintiff's allegations.

---

[2] In addition to Plaintiff's Statement of Claim [Doc. 1-1], she filed several exhibits, one of which is her notice of right to sue issued by the Equal Employment Opportunity Commission ("EEOC") on May 3, 2024. *See, e.g.*, [Doc. 1-2].

"Pro se pleadings are held to a less stringent standard than pleadings drafted by attorneys and will, therefore, be liberally construed." *Hughes v. Lott*, 350 F.3d 1157, 1160 (11th Cir. 2003). So, in heeding that well-known requirement, the Court would simply say this: In comparison to the many pro se complaints filed on its docket, Plaintiff's factual recitation may not be in perfect compliance, but it's good enough when it comes to presenting "short and plain statement[s]" set out in "paragraphs" as required by Rule 8 and Federal Rule of Civil Procedure 10. Fed. R. Civ. P. 8(a)(2); Fed. R. Civ. P. 10(b). After all, many, if not most, of Plaintiff's factual allegations are separated by not only dates but with specific times as well, and that's a hyper-organized pleading practice to which some lawyers can't even aspire. *See generally* [Doc. 1-1].

No, Plaintiff's pro se status doesn't allow her to masquerade legal conclusions as factual allegations in her Complaint, and the Commission was spot-on to point out each and every time she did so. *See Johnson v. Oconee Ctr. Comm. Serv. Bd.*, No. 5:24-cv-00208-TES, 2024 WL 4392378, at *5 (M.D. Ga. Oct. 3, 2024) (citing *McCullough*, 907 F.3d at 1333); *see, e.g.,* [Doc. 4-1, pp. 1–2, 4]. To be candid, Plaintiff's Complaint is chock full of legal conclusions—legal conclusions that the Court (in accordance with *McCullough*) disregarded in assessing whether she states a claim for relief upon which relief may be granted. 907 F.3d at 1333 (quoting *Iqbal*, 556 U.S. at 679); *Oconee Ctr.*, 2024 WL 4392378, at *5; *Barreth*, 2020 WL 4370137, at *2 (citation omitted). More than that, though, in stacking everything against her it possibly can, the Commission claims that Plaintiff's

6

non-compliance with the pleading requirements of Rules 8 and 10 "unduly impairs [its] ability . . . to discern what [Plaintiff] is claiming, to analyze and formulate possible defenses, to frame its responsive allegations, and to otherwise prepare a responsive pleading." [Doc. 4-1, p. 10]. Lumping Plaintiff's Complaint into the realm of "bemoaned," impermissible shotgun pleadings because of how she presents the facts of her case, the Commission—despite its merits-based arguments attacking each of Plaintiff's claims—seems just absolutely befuddled about what she uses to support them. [*Id.* at p. 8 (quoting *Vibe Micro, Inc. v. Shabanets*, 878 F.3d 1291, 1294–95 (11th Cir. 2018))]; *see also Johnson v. City of Fort Lauderdale*, 126 F.3d 1372, 1376 n.4 (11th Cir. 1997).

Obviously, Plaintiff's Complaint wasn't as clean, streamlined, or cut and dry as if drafted by an attorney, and "[w]hile the [C]ourt has attempted to decipher [her] legal claims and [her] corresponding [factual allegations]" to support them, it "will not cull through the record" to make her claims for her. *Cazeau v. Wells Fargo Bank, N.A.*, No. 1:13-CV-0260-AT-JFK, 2014 WL 11444089, at *2 (N.D. Ga. May 29, 2014). After all, the leniency given to pro se pleadings "does not give a court license to serve as de facto counsel for a party or to rewrite an otherwise deficient pleading in order to sustain an action." *GJR Invs., Inc. v. Cnty. of Escambia*, 132 F.3d 1359, 1369 (11th Cir. 1998), *overruled in part on other grounds as recognized in Randall v. Scott*, 610 F.3d 701, 709 (11th Cir. 2010).

Rather than give a verbatim recitation of what she included in her Statement of Claim as a part of her Complaint, the Court uses Plaintiff's "dates and times of

incidences" to illustrate a lengthy—but somewhat paraphrased—rundown of this case's underlying facts. Again, the following *allegations* surrounding these incidences—to the extent they are *factual allegations* and not legal conclusions—are assumed to be true and any reasonable inferences that may be drawn from them are construed in the light most favorable to Plaintiff. *See Twombly*, 550 U.S. at 556; *Iqbal*, 556 U.S. at 678.

"[A]s [they were] happening," Plaintiff documented what she considered to be incidences of discriminatory and harassing conduct and turned them in via a formal complaint into Elaine Fitzgerald, the Commission's human resources director. [Doc. 1-1, pp. 1, 9]. After Fitzgerald investigated, she sent an email containing her final decision on Plaintiff's concerns. [*Id.* at p. 1]. While the email "was supposed to be just for [Plaintiff]" and (maybe) the Commission's executive director, Jeff Ruggieri, Plaintiff claims that Fitzgerald—who has been in human resources for more than 25 years and knows "how to 'play the game'"—"intentionally leaked" it, revealing to "the entire Planning and Zoning Department" that it was Plaintiff who complained about her co-workers. [*Id.* at pp. 1–2, 13–14]. Within half an hour, Fitzgerald made rounds to at least three individuals—Haley Law, Margaret Peth, and John Langstaff—and instructed them to delete the email. [*Id.* at pp. 1, 10–11]. It wasn't long until Fitzgerald made her way into Plaintiff's office, closed the door, and informed Plaintiff "that she accidentally sent [the final decision] to everyone because they were . . . on an email chain of everyone she had investigated." [*Id.* at p. 1].

Despite feeling embarrassed by what had happened, Plaintiff showed up for work the following morning, which was a Thursday. [*Id.* at p. 2]. Normally—well, for about a month at that point—Tuesday and Thursday mornings were set aside for department staff meetings, except they didn't have one that morning. [*Id.*]. Instead, the Commission's assistant director, Butch Sementilli, spent nearly an hour speaking with Peth in her office, and then he met with Langstaff for about 45 minutes. [*Id.*]. It wasn't long until Ruggieri summoned Plaintiff into his office and told her: "[A]s you know[,] you are within the probationary period, and we have decided not to move forward with you working here with today"—October 27, 2022—"being your last day." [*Id.*]. Ruggieri also told Plaintiff that someone from human resources[3] would be "waiting . . . to escort [her] out." [*Id.*]. While Plaintiff closed down her computer, she "attempted to delete [her] files off the desktop," and the human resources representative said to her, "[D]on't you go deleting files." [*Id.* at pp. 2, 12]. The representative then asked Plaintiff for her computer login and keys and told her, "I am so sorry[,] Chountelle." [*Id.* at pp. 2, 12–13]. Plaintiff left the office. [*Id.*].

Now, all of that tells what happened from the time Plaintiff made her formal complaint to human resources up until the Commission fired her. What did she complain *about*, though? Out of more than 20 incidences, Plaintiff openly admits that

---

[3] According to Plaintiff's allegations, Fitzgerald was not in the office that morning. *See* [*id.* (Ruggieri's alleged statement to Plaintiff that ". . . Fitzgerald is currently not here and will follow up with additional information")].

there are three for which she doesn't have an exact date. [*Id.* at p. 11]. For the rest, however, Plaintiff lays out each incident in chronological date order. [*Id.* at pp. 3–13].

Mid-morning on August 25, 2022, Sementilli made comments "about how he wanted to be a better manager," how Langstaff "was going to help him be a better manager," and that Plaintiff was "going to help him be a better husband to his wife." [*Id.* at pp. 3, 11]. On September 1, 2022, around 9:45 a.m., Fitzgerald called Plaintiff into her office "to discuss [an] email [that Plaintiff] sent to her and . . . Sementilli regarding the dates and times [Plaintiff] documented . . . Peth displaying very harsh treatment, biasness, and discrimination towards [her] that created a very hostile work environment." [*Id.* at pp. 3, 13]. Since Plaintiff fails to allege the specifics regarding Peth's actions, what Plaintiff has provided for this date is nothing more than legal conclusions. Without any facts to support these legal conclusions, there's nothing in this allegation that is entitled to the presumption of truth. *McCullough*, 907 F.3d at 1333 (quoting *Iqbal*, 556 U.S. at 679) (holding that a plaintiff may use legal conclusions to structure a complaint, but they "must be supported by factual allegations"); *see also Iqbal*, 556 U.S. at 681. Nevertheless, after Plaintiff's meeting with Fitzgerald ended, Sementilli asked Plaintiff, "in a very smart manner," "[S]o, how did the meeting with you and [Fitzgerald] go?" [Doc. 1-1, p. 3].

On September 21, 2022, the Commission's planning director, Michael Greenwald, wanted to have a meeting with Langstaff; Peth; and another woman from Plaintiff's

department, Maryam Yarahmadi. [Doc. 1-1, p. 3]. Plaintiff was not included in that meeting (or another one that Greenwald called), nor was she invited to meet individually with Greenwald for planning trainings like Langstaff, Peth, and Yarahmadi were. [*Id.*]. Also on September 21, 2022, Plaintiff mentions that Sementilli asked her to come to his office and explain why she didn't send some application out. [*Id.*]. Plaintiff states that "[o]n [her] end[,] the application was completed on September 9, 2022" and that she even sent Sementilli a follow-up message asking him how to proceed. [*Id.*]. Sementilli said he "saw [her] message . . . but . . . just didn't respond." [*Id.*]. When she left Sementilli's office, Plaintiff claims that how he looked at her made her "very uncomfortable." [*Id.*].

Towards the tail end of September 2022, Sementilli asked Plaintiff to check her computer to see whether she could access the Commission's software from home. [*Id.*]. Plaintiff admits that her transportation arrangements from where she lived in Atlanta to where she worked in Macon caused her to get home "extremely late" and that she "completely forgot" to check whether she could access the software from home. [*Id.* at pp. 3–4]. When Plaintiff got to work the next morning, she says that this was the day that "everything turned for the worse." [*Id.* at pp. 9, 11]. When Sementilli asked Plaintiff about accessing the Commission's software from home, she candidly admitted that she forgot to check. [*Id.* at p. 4]. Using her cellphone, Plaintiff confirmed that she could access the software outside of the office, and she quickly let Sementilli know. [*Id.*]. Once

Plaintiff told Sementilli that she "could log into [the Commission's] system from [her] phone," he responded, "in rage, anger, and a temper," "[T]hat's not the problem, the problem is that you did not do what I asked you to do." [*Id.*]. Plaintiff emailed Ruggieri about how Sementilli spoke to her, but Ruggieri "was very dismissive." [*Id.*].

Then, four days into October 2022, Plaintiff, Langstaff, Yarahmadi, Peth, Sementilli, and Ruggieri all attended a staff meeting together. [*Id.*]. According to Plaintiff's allegations, Sementilli used this staff meeting to "try and cover" himself and "water down" how he spoke to Plaintiff just after she confirmed her ability to access the Commission's software from home. [*Id.*]. Apparently, Sementilli "tried to recreate the scene in front of Ruggieri and said, 'I gave you all tasks to do and asked you all to do something, and none of you all did it.'" [*Id.*]. Plaintiff then chimed in, reminding Sementilli that "even though [she] forgot, [she] took the initiative to do as he told [her] to do." [*Id.*]. Ruggieri interjected and said, "[S]top talking back to him, there is no need to respond." [*Id.*].

As the staff meeting progressed, Plaintiff circled back to how Sementilli spoke to her, and she said, "I know we all have personal things going on in our lives, but I think it should be no excuse for us to take out our anger on others[,] especially in the [workplace]." [*Id.*]. It was then Plaintiff made sure to say that she had been "professional and respectful towards everyone . . . despite the goings on that have taken place in [her] life," and she urged everyone to realize the importance of "leav[ing] the

attitude at the door and not put people . . . in hostile and toxic work environments." [*Id.* at pp. 4–5]. To that, Ruggieri said, "[It's] not about how you feel, no one cares how you feel. . . . [P]eople call me an asshole all the time. [D]o you think I care[?] [It's] about getting the job done."[4] [*Id.* at p. 5].

After that staff meeting, Ruggieri walked around the office, supervising differently than usual—as if "to prove that he was the boss and in charge." [*Id.*]. To put it in Plaintiff's words, when Ruggieri didn't say "Hey" back to her as she walked past him while he was on the phone, he "really came off just very intimidating." [*Id.*]. Then, later that afternoon, Sementilli—standing close to Plaintiff "in an intimidating manner"—made several inquires about what appears to be some of the projects on which Plaintiff was involved. [*Id.*]. Sementilli accused Plaintiff "of sending a zoning letter with the wrong zoning compliance at the top of the letter,"[5] but Plaintiff informed him, Ruggieri, and Fitzgerald that it was, in fact, Sementilli who "put the wrong zoning compliance . . . in front of the zoning letter." [*Id.* at p. 6]; *see, e.g.*, [Doc. 1-5, p. 8].

The next day, Sementilli sent Plaintiff "the wrong list of items for putting together an agenda packet," and on October 6, 2022, he reported to Fitzgerald that

---

[4] Since that was "[Plaintiff's] approach" to her job as well, she agreed with Ruggieri "about putting feelings aside and getting the job done." [*Id.* at p. 5]. Plaintiff reiterates, though, that Ruggieri wasn't there when Sementilli spoke to her in "rage and anger" and that despite her emailing Ruggieri about it, "he was dismissive as usual." [*Id.*].

[5] When the Commission does zoning letters, its employees are supposed to place a specific zoning compliance in front of the zoning letter. [*Id.* at p. 6].

Plaintiff was not performing as directed. [Doc. 1-1, p. 6]. Plaintiff claims that "[t]his meeting resulted in a lot of concerning statements made by . . . Sementilli" which led to her decision to consult an attorney.[6] [*Id.*]. Plaintiff also remembers Fitzgerald "vividly [asking]" her "why was [she] documenting all of this," and as the workday continued, Plaintiff made revisions for a zoning letter at Sementilli's request but she, apparently, sent it out before she should have.  [*Id.* at pp. 6–7].

On October 10, 2022, for the first time since the Commission hired Plaintiff on August 9, 2022, she was running late for work. [*Id.* at p. 7]; [Doc. 4-1, p. 3]. Given that Plaintiff arrived at work two hours late, she thought she wasn't "able to have a lunch break." [Doc. 1-1, p. 7]. Around 4:30 that afternoon, Sementilli came to Plaintiff's office and asked, "Did you go to lunch? You must not have looked at my . . . message with the lunch schedule." [*Id.*]. Plaintiff responded that she "did not know [she] was allowed to go to lunch since [she] came in late." [*Id.*]. Then, as Sementilli turned and walked out of Plaintiff's office, "he nodded his head up and down" but was "visibly upset" because he "balled up his fist" "as if [she] intentionally chose not to look at his schedule." [*Id.*].

The following day, Sementilli wanted Plaintiff to redo two zoning letters. [*Id.*].

---

[6] Regarding the "concerning statements" allegedly made by Sementilli, Plaintiff completely fails to state what they were. To be sure, Plaintiff directs the Court to "see" her meeting notes from October 6, 2022, but it's not the Court's duty or obligation to cull through the record and build Plaintiff's case for her. [*Id.*]; *City of Fort Lauderdale*, 126 F.3d at 1373 (noting that courts have no duty to "cull the record" to find support for a party's claims); *Cazeau*, 2014 WL 11444089, at *2. In any event, where legible, the Court reviewed Plaintiff's submissions filed as part of her Complaint, and it didn't see any meeting notes from that date.

Those zoning letters, however, had apparently "already been sent off to the client per [Sementilli's] approval."[7] [*Id.*]. Plaintiff asked Sementilli why he waited until the zoning letters had already been sent before asking her to make revisions, and he responded that he "wanted the letters to go out" within three to four business days. [*Id.*]. While what Plaintiff alleges Sementilli said in response didn't really provide a direct answer to her question, Plaintiff claims that Sementilli emailed her that "it was okay to send [the zoning letters] to [the] client." [*Id.*]. It's "situations like this," one's where Sementilli would "flip-flop" and "paint[ ] . . . picture[s] to make it appear that [Plaintiff] was not doing what he asked" in order "to get [her] in trouble." [*Id.*]; [Doc. 1-3, p. 1].

At 9:46 a.m. on October 13, 2022, Sementilli asked Plaintiff "why something was not complete." [Doc. 1-1, p. 7]; *see, e.g.*, [Doc. 1-4, pp. 12–1]4. Even though Plaintiff replied with a follow-up email showing that project's completion, she goes on to allege that Sementilli "sabotaged" one of her zoning letters by marking all over it when—according to Plaintiff—there was "nothing wrong with [it] other than [him] wanting" her to use the phrase "formally known as" for a description. [Doc. 1-1, p. 7]; *see, e.g.*, [Doc. 1-4, p. 14]. In making a record of these alleged incidents, Plaintiff claims that she emailed Fitzgerald on October 14, 2022, who stated that Plaintiff should address her issues with Sementilli directly. [Doc. 1-1, p. 8]. "[A]ren't you [human resources?],"

---

[7] According to Plaintiff's allegations, zoning letters were not allowed to be sent until reviewed and approved by Sementilli. [*Id.*].

Plaintiff replied. [*Id.*]. After Plaintiff sent that email, Sementilli and Ruggieri apparently

started emailing Fitzgerald, "telling her that [Plaintiff] was doing [her] zoning letters

wrong." [*Id.*]. All of this, of course, landed Plaintiff in a meeting with Fitzgerald. [*Id.*].

As soon as Plaintiff walked into that meeting, Fitzgerald said, "I am really trying

to see how to deal with this regarding you two." [*Id.*]. During their meeting (which

lasted no more than 15 minutes), Plaintiff discussed how she reached out to Fitzgerald,

Sementilli, and Ruggieri three times regarding the incident about the zoning letter. [*Id.*].

Plaintiff also showed Fitzgerald the zoning letter Sementilli "sabotaged" and her email

communications with Sementilli to try and show how he was "overly supervising" her

and "overly controlling." [*Id.*]. Plaintiff also claims that, at times, Sementilli would have

Peth "overly supervis[e]" Plaintiff as well to keep his "eye on [her]." [*Id.*]. Plaintiff states

that she "did not see other members in [her] department being treated this way" and

that Sementilli would use this "method of management"—his way of ensuring that

everyone in the department was just "helping one another out"—to disguise his

discrimination. [*Id.*]. All in all, the main thing Plaintiff tried to get Fitzgerald to see what

that Sementilli would take advantage of his position of authority by "ask[ing] [Plaintiff]

to do something when he knew the task was already done just to paint a narrative as if

[she] was not doing" as directed. [*Id.* at pp. 8–9].

On October 18, 2022, Plaintiff emailed Fitzgerald and Sementilli some of the

notes she had previously provided to an attorney about how Sementilli's "angry

tempers" created a "very hostile work environment." [*Id.* at p. 9]. Again, Plaintiff's legal conclusion that Sementilli subjected her to a "very hostile work environment" isn't entitled to any presumption of truth, but aside from that, it should be clear by now that Plaintiff—because of how Sementilli responded to her when she told him she could access the Commission's software from outside the office—generally perceived Sementilli to be an angry person towards her.[8] [*Id.* at pp. 9, 11]; *McCullough*, 907 F.3d at 1333 (quoting *Iqbal*, 556 U.S. at 681). Fitzgerald responded to Plaintiff's email saying that "she received [her] message about suing [the Commission] for discrimination." [Doc. 1-1, pp. 9, 13]. Plaintiff, however, claims that she never mentioned that she was interested in suing but only mentioned that she contacted an attorney because of something Sementilli said in their October 6 meeting—that "he did not want to work with [Plaintiff] anymore." [*Id.*]. It was from that point on Plaintiff claims that she knew Sementilli "was going to engage in certain tactics and retaliating tactics setting [her] up to get fired." [*Id.*].

Two days later, Plaintiff went to Fitzgerald's office to file a formal discrimination and harassment complaint, and that is, ostensibly, what led Fitzgerald to conduct her

---

[8] At some point, Plaintiff doesn't remember when exactly, Sementilli "began rubbing his mustache" as she walked by him, and she claims that "[she] could sense a lot of anger geared towards [her] by him." [*Id.* at p. 11]. Then, on some other unknown date, Sementilli came to Plaintiff's office and sat himself across from her desk. [*Id.*]. Plaintiff claims that she could feel herself "becoming almost numb and stuck" through "some kind of device" Sementilli was "intentionally us[ing] to electrocute [her]." [*Id.* at pp. 11–12]. And finally, Plaintiff claims that Sementilli would mock an African American woman who regularly came to the Commission. [*Id.* at p. 12].

investigation and issue her final decision via that (allegedly) "intentionally leaked" email.[9] [*Id.* at pp. 1, 9–10]. With that, Plaintiff's story has finally come full circle. In concluding why she brought this lawsuit, Plaintiff states that she was the only one subject to this kind of treatment by the Commission, and she believes it was because she is African American. [*Id.* at pp. 13–14]. As Plaintiff puts it, Sementilli was "very[,] very[,] very crafty in making it seem [like she] was not doing as he asked" as a retaliation tactic to get her fired. [*Id.* at p. 13]. As damages for what she's alleged in her Complaint, Plaintiff seeks $7.5 million related to, *inter alia*, stress-induced mental and physical pain and suffering. [*Id.* at pp. 16–17].

## <u>DISCUSSION</u>

The above factual narrative is largely plucked from Plaintiff's Statement of Claim. In other words, it extensively details the most pertinent parts of what Plaintiff says happened to her during her brief employment with the Commission. Liberally construed, the gravamen of Plaintiff's Complaint is that the Commission, in violation of Title VII, discriminated against her, subjected her to a hostile work environment[10]

---

[9] Plaintiff also mentions that on October 25, 2022, Ruggieri and other employees of the Commission sat through a staff meeting—not to discuss anything involving Plaintiff and Sementilli, directly, but to discuss issues and concerns related to zoning letters. [*Id.* at p. 10]. When Plaintiff gave some input at this staff meeting, Ruggieri "side eyed [her] as if what [she] said bothered him" and "put up his right hand as in a way to dismiss [her]." [*Id.*].

[10] *Reeves v. C.H. Robinson Worldwide, Inc.*, 594 F.3d 798, 807 (11th Cir. 2010) (en banc) (quoting *Hulsey v. Pride Rests., LLC*, 367 F.3d 1238, 1245 (11th Cir. 2004)) ("Disparate treatment can take the form either of a 'tangible employment action,' such as a firing or demotion, or of a 'hostile work environment' that changes 'the terms and conditions of employment, even though the employee is not . . . demoted[ ] or reassigned.'").

because of her race and color,[11] and retaliated against her by firing her for making

complaints of perceived discrimination and harassment to human resources. *See* [Doc. 1,

pp. 3–4] *in connection with* [Doc. 1-1].

Title VII makes it unlawful for an employer "to discriminate against any

individual with respect to h[er] compensation, terms, conditions, or privileges of

employment, because of such individual's race, color, religion, sex, or national origin."

42 U.S.C. § 2000e-2(a)(1). Further, employers are also prohibited from retaliating against

"any . . . employee[ ] . . . because [s]he has opposed any practice made an unlawful

---

[11] The Commission notes that Plaintiff's EEOC charge "does not allege that [the Commission] discriminated against her based on her color." [Doc. 4-1, p. 3]. Although the Commission did not file a copy of Plaintiff's EEOC charge on the record, it did paste a portion of it into its brief. [*Id.*]; *see also SFM Holdings, Ltd. v. Banc of Am. Sec., LLC*, 600 F.3d 1334, 1337 (11th Cir. 2010) ("In ruling upon a motion to dismiss, [a] district court may consider an extrinsic document if it is (1) central to [a] plaintiff's claim, and (2) its authenticity is not challenged."); *Chesnut v. Ethan Allen Retail, Inc.*, 971 F. Supp. 2d 1223, 1228–29 (N.D. Ga. 2013) (considering EEOC charge to determine timeliness of filing without converting to motion for summary judgment) (collecting cases). From what the Commission submitted in its brief, it's clear that Plaintiff did not mention color discrimination in her EEOC charge. [Doc. 4-1, p. 3]. She only mentioned race. [*Id.*].

Before suing under Title VII an aggrieved employee must first exhaust the required federal administrative remedies by filing a charge of discrimination with the EEOC. *Wilkerson v. Grinnell Corp.*, 270 F.3d 1314, 1317 (11th Cir. 2001). "Exhaustion serves one primary purpose: to allow the EEOC to 'have the first opportunity to investigate the alleged discriminatory practices [so that it can] perform its role in obtaining voluntary compliance and promoting conciliation efforts.'" *Collins v. Navicent Health, Inc.*, 499 F. Supp. 3d 1307, 1327 (M.D. Ga. 2020) (quoting *Chesnut v. CC Servs., Inc.*, No. 5:18-CV-404 (MTT), 2020 WL 1433876, at *4 (M.D. Ga. Mar. 24, 2020)). Considering the purpose of the EEOC exhaustion requirement, the Eleventh Circuit has held that a "plaintiff's judicial complaint is limited by the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination." *Gregory v. Ga. Dep't of Hum. Res.*, 355 F.3d 1277, 1280 (11th Cir. 2004). With this in mind, the Court notes that "new acts of discrimination [lodged in a judicial complaint] are inappropriate." *Batson v. Salvation Army*, 897 F.3d 1320, 1327 (11th Cir. 2018) (quoting *Gregory*, 355 F.3d at 1280). Therefore, Plaintiff's effort to bring an unexhausted claim for color discrimination in her Complaint is improper because color discrimination cannot "reasonably be expected to grow out of the charge of discrimination." *Gregory*, 355 F.3d at 1280; *see also* [Doc. 1, p. 4]. Consequently, to the extent Plaintiff sought to bring a claim for color discrimination, it is **DISMISSED without prejudice**. [Doc. 1, p. 4].

employment practice" by Title VII, "or because [s]he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]." *Id.* at § 2000e-3(a).

### 1.    <u>Discrimination</u>

Again, there's a considerable amount to unpack when it comes to Plaintiff's claims, and in case you missed it, she worked for the Commission for only about two-and-a-half months—from August 9, 2022, through October 27, 2022. [Doc. 1-1, p. 1]; [Doc. 4-1, p. 3]. Upon its review of what Plaintiff alleges happened to her during that short time, the Commission argues that none of her allegations "show that [she was] somehow treated . . . differently based on any protected characteristic"—her race. [Doc. 4-1, p. 2]. While it may not be phrased in the style the Commission so obviously prefers, Plaintiff unequivocally alleges that she thinks "the behavior that was displayed towards [her]" was because she "was the only African American" "within this department."[12] [Doc. 1-1, pp. 13–14]; *but see* [Doc. 1-1, p. 15 (Plaintiff's allegation suggesting that there is an African American clerk who also worked for the Commission)]; [Doc. 4-1, p. 11 n.3 (the Commission's statement that Fitzgerald "is also of African American descent")]. Even though Plaintiff is pro se, what she's trying to assert is clear.

---

[12] It's unclear what Plaintiff means when she states, "within this department." [Doc. 1-1, p. 14]. Regardless of whether Plaintiff was "the only" African American within her specific department within the Commission or whether she was (unlikely) "the only" African American within the Commission as a whole, what's important is the core of her allegation that "the behavior that was displayed towards [her]" was because she's African American. [*Id.* at pp. 13–14].

"Likewise," the Commission argues, "a review of [Plaintiff's] Complaint reveals that it is completely silent as to the identity of any other employee who she . . . contends received more favorable treatment." [Doc. 4-1, p. 2]. To the extent the Commission seeks dismissal of Plaintiff's race-based disparate treatment claim on the basis that she failed to point to a comparator in her Complaint—someone who, in court-speak, was "similarly situated" to her "in all material respects"—such an argument would be misplaced. *Lewis v. City of Union City*, 918 F.3d 1213, 1217, 1224 (11th Cir. 2019) (en banc).

Pointing to an individual who is "similarly situated in all material respects" goes to the heart of establishing a prima facie case for employment discrimination claims under *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and the make or break of a prima facie case is not a pleading standard by which to measure the legal sufficiency of a complaint asserting such claims. *Davis v. Mia.-Dade Cnty.*, No. 23-12480, 2024 WL 4051215, at *3 (11th Cir. Sept. 5, 2024). "The Supreme Court has held that an employment discrimination plaintiff need not plead specific facts establishing a prima facie case under the burden-shifting framework established in *McDonnell Douglas*." *Horace v. ARIA*, No. 23-12414, 2024 WL 1174398, at *4 (11th Cir. Mar. 19, 2024) (citing *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 510–12 (2002)). Thus, when it comes to disparate treatment in the employment context, it is well established that an employee doesn't have to plead a prima facie case in the complaint. *Surtain v. Hamlin Terrace*

*Found.*, 789 F.3d 1239, 1246 (11th Cir. 2015) (per curiam). So, contrary to what it appears the Commission argued, the fact that Plaintiff's Complaint "is completely silent" as to a comparator cannot (at the pleadings stage) serve as a basis to dismiss a race-based disparate treatment claim. [Doc. 4-1, p. 2]; *see Swierkiewicz*, 534 U.S. at 511 ("[The Supreme Court] has never indicated that the requirements for establishing a prima facie case under *McDonnell Douglas* also apply to the pleading standard that plaintiffs must satisfy in order to survive a motion to dismiss.").

Although Plaintiff's Complaint may not mention (nor does it have to) the specific person or persons she expects to classify as a comparator, she clearly states that the Commission's other employees "were in no way" treating one another like they treated her. [Doc. 1-1, p. 13]. In any event, when it comes to employment discrimination cases, it must be remembered that even when an aggrieved employee fails to produce outright a valid comparator, the Eleventh Circuit has observed that such a failure "does not necessarily doom [that] plaintiff's case," even at the later stages of litigation. *Tynes v. Fla. Dep't Juv. Just.*, 88 F.4th 939, 946–47 (11th Cir. 2023).

For now, though, the Court's focus is through a Rule 12(b)(6) lens, and no matter how many allegations may be present in a complaint, "a Title VII plaintiff, like any other plaintiff, must still satisfy the plausibility standard set forth in *Twombly* and *Iqbal*." *Horace*, 2024 WL 1174398, at *4 (citing *Surtain*, 789 F.3d at 1246). With that in mind and with any discussion of a comparator shoved to the backburner; to state a race

discrimination claim under Title VII, "a complaint need only provide enough factual matter (taken as true) to suggest intentional . . . discrimination." *Surtain*, 789 F.3d at 1246. "The complaint must satisfy the plausible-on-its-face standard, and the allegations must be sufficient to raise a right to relief above the speculative level." *Horace*, 2024 WL 1174398, at *4 (citing *Edwards v. Prime, Inc.*, 602 F.3d 1276, 1301 (11th Cir. 2010)).

Here, liberally construed, and taking all of Plaintiff's allegations as true (as the Court must at this stage), *Twombly*, 550 U.S. at 572, and in the light most favorable to her, *Hawthorne*, 140 F.3d at 1370, there is enough to plausibly state a claim that Plaintiff received (what she considers) less-than-preferable treatment while working for the Commission because she's African American. [Doc. 1-1, pp. 13–14]. To be clear, this in no way means the Commission discriminated against Plaintiff in violation of Title VII, it merely means she is entitled to offer evidence to support her discrimination claim. *Scheuer*, 416 U.S. at 236.

### 2.    <u>Hostile Work Environment</u>

Now, with respect to Plaintiff's hostile work environment claim, at issue is whether the conduct alleged pervaded the Commission such that it "exposed [Plaintiff] to disadvantageous terms or conditions of employment to which members [outside of her race] [were] not exposed." *Reeves*, 594 F.3d at 808.

An employer is responsible for a racially hostile work environment, and therefore violates Title VII, when "the workplace is permeated with discriminatory

intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment." *Fernandez v. Trees, Inc.*, 961 F.3d 1148, 1152 (11th Cir. 2020) (citation omitted). To establish a hostile work environment claim based on race, a plaintiff must show five things: (1) she is a member of a protected class; (2) she experienced unwelcome harassment; (3) the harassment was race-based; (4) the harassment was "severe or pervasive enough to alter the terms and conditions of [her] employment and create a discriminatorily abusive working environment;" and (5) "the employer is responsible for the environment under a theory of either vicarious or direct liability." *Adams v. Austal*, U.S.A., L.L.C., 754 F.3d 1240, 1248–49 (11th Cir. 2014) (citing *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1275 (11th Cir. 2002)); *see also Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1245 (11th Cir. 1999).

Of course, the Court isn't going to recap everything here, but as an African American, Plaintiff is certainly a member of a protected class, and as a general synopsis, she alleges that she "was isolated," that Sementilli lied about her work performance, that he was constantly angry towards her, and that he "overly supervised" her. [Doc. 1-1, pp. 9, 11, 16]. By all accounts, Plaintiff alleges she felt harassed, and it's clear that she didn't appreciate how Sementilli and *most* of her other co-workers treated her. [*Id.*]; *see also* [Doc. 1-1, p. 14 (Plaintiff's statement that Langstaff "was the only one [who] treated [her] with respect" during her employment with the Commission)]. The third element—that the harassment must be race-based—requires a bit more of an analysis, so the

Court will address it after looking at the fourth and fifth elements.

The inquiry under the fourth element contains both an objective and subjective component. *Miller*, 277 F.3d at 1276. In other words, a reasonable person must find the harassment to be sufficiently severe or pervasive, and Plaintiff must (subjectively) find it to be so. *Adams*, 754 F.3d at 1249. In evaluating the objective severity of the harassment, courts consider, among other factors: (1) how often the conduct occurs; (2) how severe the conduct is; "(3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance." *Miller*, 277 F.3d at 1276. In applying these factors to Plaintiff's case, she easily meets the frequency requirement. Even though her employment with the Commission lasted less than three months, Plaintiff has sufficiently alleged enough incidences—more than 20 by the Court's count—of what she chalks up to be harassing conduct.

It is a "bedrock principle that not all objectionable conduct or language amounts to [harassment] under Title VII." *Reeves*, 594 F.3d at 809. Title VII is not a "general civility code" and does not make ordinary workplace conflicts actionable. *Cotton v. Cracker Barrel Old Country Store, Inc.*, 434 F.3d 1227, 1234 (11th Cir. 2006) (citation omitted). It does not prohibit profanity. *Reeves*, 594 F.3d at 809 (citation omitted). It does not prohibit "genuine but innocuous differences in the ways men and women routinely interact with members of the same sex and of the opposite sex" in the workplace.

*Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (quoting *Oncale v. Sundowner*

*Offshore Servs. Inc.*, 523 U.S. 75, 81 (1998)). "Instead, Title VII prohibits discrimination,

including harassment, that discriminates based on a protected category such as [race]."

*Reeves*, 594 F.3d at 809 (citation omitted).

Speaking in big-picture terms, Plaintiff takes issue with how Sementilli and

others treated her, and she thinks it was because she's African American. [Doc. 1-1, pp.

13–14]. Although it seems that Plaintiff just endured a series of unpleasantries during

her employment with the Commission there's no denying that *something* culminated in

a "tangible employment action" against her—she was, after all, fired. *Cotton*, 434 F.3d at

1231. Now, back to the third element for Plaintiff's hostile work environment claim.

The Court notes that—as alleged—Plaintiff's race was *never* brought up by

Sementilli or by anyone with whom Plaintiff worked. That's right. Not once, in all of

Plaintiff's allegations did she ever claim that Sementilli or anyone made a comment

about her race. *See* [Doc. 4-1, p. 13]. Looking strictly at what Plaintiff puts forth as her

"incidences" of unlawful conduct, it seems that what allegedly happened to her had

nothing to do with a protected characteristic. However, the Court cannot ignore

Plaintiff's summarizing and obvious catch-all allegation that the allegedly

discriminatory and hostile treatment she endured while employed at the Commission

was because she is African American. [Doc. 1-1, pp. 13–14].

Given the liberal construction due to Plaintiff's Complaint as a pro se litigant and in reviewing it through what's required under Rule 8, *Twombly*, *Iqbal*, and *McCullough*, her hostile work environment claim will proceed (albeit barely) for further factual development. Again, this in no way means the Commission subjected Plaintiff to a hostile work environment since there must be a causal link between the allegedly harassing behavior and her race. *Cotton*, 434 F.3d at 1231. The Court's ruling on this claim merely means she is entitled to offer evidence to support it. *Scheuer*, 416 U.S. at 236.

### 3.    <u>Retaliation</u>

Lastly, the anti-retaliation provision of Title VII provides that "an employer may not take action against an employee for bringing or aiding a Title VII charge." 42 U.S.C. § 2000e-3(a). In *Burlington Northern & Santa Fe Railway Co. v. White*, the Supreme Court held that this provision only protects an individual "from retaliation that produces an injury or harm." 548 U.S. 53, 67–68 (2006). Therefore, it must be shown "that a reasonable employee would have found the challenged action materially adverse, 'which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.* "An employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience." *Id.* at 68 (quoting *Oncale*, 523 U.S. at 80).

Although the Court briefly mentioned this above, it bears repeating once more with respect to Plaintiff's retaliation claim. Plaintiff's Complaint never alleges that she made complaints to Fitzgerald about Sementilli, Ruggieri, Peth, or any of her co-workers for that matter, launching race-based comments towards her. The Commission argues that Plaintiff certainly alleged in her Complaint that she "complained about 'discrimination and harassment.'" [Doc. 4-1, p. 15]. However, the Commission also notes that Plaintiff stops short of alleging that she informed Fitzgerald that she was being treated poorly *because of her race*. [*Id.*]. To be sure, Plaintiff only connects what allegedly happened to her while she worked at the Commission to her race *in her Complaint* via her claim that the Commission discriminated against her and subjected her to a hostile work environment because she's African American. [Doc. 1-1, pp. 13–14]. She did not, however, allege that she made such a complaint to Fitzgerald.

Yes, Plaintiff connects her alleged treatment to her race for *this lawsuit*, but there is no specific, letter-by-letter allegation that Plaintiff communicated that to Fitzgerald: That Plaintiff thought Sementilli and others treated her the way they did due to her race. While its clear that Plaintiff believes she was "being 'singled out,' being subjected to 'a campaign of harassment,' and working in a 'hostile environment,'" she doesn't specifically allege that she told Fitzgerald that the alleged treatment came about in relation to or in response to some protected characteristic. *Jeronimus v. Polk Cnty. Opportunity Council, Inc.*, 145 F. App'x 319, 326 (11th Cir. 2005); [Doc. 4-1, p. 15]. Based

on that, the Commission points to one scenario in which the Eleventh Circuit instructed that an employee cannot rely on her employer to connect the dots to "infer that discrimination has occurred." *Demers v. Adams Homes of Nw. Fla., Inc.*, 321 F. App'x 847, 852 (11th Cir. 2009). Nevertheless, the plain language of Title VII makes it unlawful "to discriminate against any individual . . . because [s]he has opposed any practice made an unlawful employment practice," and "discrimination and harassment"—the very things about which the Commission recognized she complained—are unquestionably covered. 42 U.S.C. § 2000e-3; *Miller*, 277 F.3d at 1269; [Doc. 4-1, p. 15]; *see also* [Doc. 1-1, p. 13 ("When I came to this office every day, it was to do my work which I did nevertheless I was met with so much harassment, hostility, bullying, overly supervision, and retaliation that continued due to me telling [human resources] what they were doing.")].

Given the causal links that must be made with respect to Plaintiff's discrimination and hostile work environment claims, whether Plaintiff opposed an allegedly unlawful employment practice—even though she never mentioned a word about her race to Fitzgerald—is a question for another day. To be sure, the Court doesn't disagree that "a review of [Plaintiff's] Complaint [alleges] that she only complained to Fitzgerald about Sementilli's management style, her disagreements with Sementilli's directions and instructions regarding her work product, and his alleged 'angry temper[,]'" but the Court's ruling diverges from the Commission's ultimate

position because of Plaintiff's allegation that "the behavior that was displayed towards [her]" was because she's African American. [Doc. 1-1, pp. 13–14]. Not to put too fine a point on it, but that one sentence was Plaintiff's saving grace for her claims. So, giving Plaintiff the appropriate amount of leniency as a pro se litigant, her Complaint alleges claims that attack her working conditions and her co-worker's—mainly Sementilli's—motivations for creating those conditions. *See Laster v. Ga. Dep't of Corrs.*, No. 22-13390, 2023 WL 5927140, at *3 (11th Cir. Sept. 12, 2023). Complaining of those things—to the extent they existed because of her race—in connection with the fact that Plaintiff was fired *the day after* Fitzgerald concluded her investigation plausibly alleges a retaliation claim. [Doc. 1-1, pp. 1–2].

After all, to survive dismissal, there must only be "a reasonable expectation that discovery will reveal evidence" supporting a claim—a reasonable expectation that the Commission fired Plaintiff because "she complained about 'discrimination and harassment." *Twombly*, 550 U.S. at 556; [Doc. 5-2, p. 2]. Establishing the necessary causation for a retaliation claim, requires an employee to demonstrate that "'her protected activity was a but-for cause of the alleged adverse action by the employer.'" *Gogel v. Kia Motors Mfg. of Ga., Inc.*, 967 F.3d 1121, 1135 (quoting *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 362 (2013)). This inquiry, like many others related to Plaintiff's discrimination and hostile work environment claims, requires a more developed record for resolution at summary judgment.

## <u>CONCLUSION</u>

Based on the foregoing, the Court **GRANTS in part** and **DENIES in part** the Commission's Moton to Dismiss [Doc. 4]. Accordingly, the Court **DISMISSES** Plaintff's claim under O.C.G.A. § 16-10-94 **with prejudice**, and it **DISMISSES** her discrimination, hostile work environment, and retaliation claims based on color **without prejudice**. However, Plaintiff's race-based claims for discrimination, a hostile work environment, and retaliation shall proceed for further factual development. The Court **FURTHER ORDERS** that the **STAY** imposed on September 4, 2024, is hereby **LIFTED**. The Court will soon order the parties to confer and develop a scheduling and discovery order pursuant to Federal Rules of Civil Procedure 16 and 26.[13]

      **SO ORDERED**, this 29th day of October, 2024.

*S/ Tilman E. Self, III*
**TILMAN E. SELF, III, JUDGE**
**UNITED STATES DISTRICT COURT**

---

[13] Plaintiff did not obtain leave of court before filing two submissions on October 27, 2024. [Doc. 12]; [Doc. 13]. The Court's Local Rules state that "[a] party desiring to file a surreply brief must move in writing for permission to do so within fourteen (14) days of the filing of the brief[.]" LR 7.3.1, MDGa. As the non-movant, Plaintiff filed her Response [Doc. 9] to the Commission's Motion on September 23, 2024. So, unless and until leave of Court was provided, Plaintiff was not allowed to file the additional briefs submitted on October 27, 2024. Therefore, the Court **STRIKES** them from the record, and her arguments contained in those two filings were not considered.

Since "[e]very party must comply with" the Court's Local rules, the Court, for Plaintiff's convenience, provides a weblink to its Local Rules, and it strongly urges Plaintiff to read these rules carefully. *See Travelers Prop. Cas. Co. of Am. v. CVB Indus. Contracting, Inc.*, 697 F. Supp. 3d 1334, 1341 (M.D. Ga. 2023); *see also* https://www.gamd.uscourts.gov/local-rules.